IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 29, 2019 at Knoxville

**RICHARD HATCHEL v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Tipton County**
**No. 7694     J. Weber McCraw, Judge**

_____

**No. W2019-00098-CCA-R3-PC**
_____

The Petitioner, Richard Hatchel, appeals as of right from the Tipton County Circuit Court's denial of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance of trial counsel due to trial counsel's failure to file a motion to suppress his two police statements. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., joined. J. ROSS DYER, J., not participating.

Richard McFall, Covington, Tennessee, for the appellant, Richard Hatchel.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Sean G. Hord, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Trial*

Following a jury trial, the Petitioner was convicted of the premeditated first degree murder of his wife, Shannon Hatchel.[1] State v. Richard Alan Hatchel, No. W2014-

---

[1] The Petitioner was also convicted of felony reckless endangerment by discharging a firearm into a habitation occupied by the victim and a small child. This conviction was reversed and dismissed on direct appeal.

00486-CCA-R3-CD, 2015 WL 12978198, at *1 (Tenn. Crim. App. Jan. 27, 2015) (perm. app. denied Dec. 15, 2016). The Petitioner received a total effective sentence of life.

At trial, the Petitioner's mother testified that the Petitioner had spent the night with her earlier in the week before the murder because he had been arguing with the victim. Hatchel, 2015 WL 12978198, at *1. The day before the murder, the Petitioner told his mother that he was going to talk to the victim the next day and "try to work things out." The following day, Friday, January 25, 2013, the Petitioner sent his mother a text message asking her to check on the victim because the Petitioner had just "hurt her real bad[.]" The Petitioner's mother was unable to contact the victim over the course of the next hour or so and eventually called the Tipton County Sheriff's Department to perform a welfare check.

Deputy Randy Lee found the victim's front door ajar, entered, and found the victim. The victim was deceased and had a gunshot wound to the chest. Hatchel, 2015 WL 12978198, at *1-2. Deputy Lee noted during his testimony that a four- or five-year-old child was standing next to the victim's body. The victim's autopsy showed no gunpowder stippling. Detective Chris Williams reviewed a neighbor's security camera recording, which showed the Petitioner's arriving at 8:04 a.m.; he stayed for about fifty minutes and then left. Id. at *1. Later, at 11:43 a.m., the Petitioner returned and went inside the house. After about five minutes, the Petitioner emerged, walked to his vehicle and stayed inside it for about two minutes, then returned to the house. The Petitioner left two minutes later and drove away.

The Petitioner's recorded January 26, 2013 police statement indicated that the Petitioner argued with the victim about money; that in an attempt to scare the victim, the Petitioner pointed a gun he believed was unloaded at the victim and pulled the trigger; and that the Petitioner shot the victim. Hatchel, 2015 WL 12978198, at *1. In a second interview on January 28, 2013, the Petitioner admitted that he loaded the gun when he went to his truck to retrieve it. He stated that he did not know why he "did it, and [he didn't] know what made [him] do it."

Tipton County 9-1-1 dispatcher Debbie Vertrees testified that on January 26, 2013, she received a hang-up call. Hatchel, 2015 WL 12978198, at *1. When she called the person back, the Petitioner answered and identified himself. The Petitioner asked Ms. Vertrees if he had an outstanding arrest warrant connected to a "shooting that occurred" at his address the previous day. The Petitioner stated that he wanted to turn himself in, and Ms. Vertrees dispatched police officers to his location.

*II. Direct Appeal*

-2-

On direct appeal, the Petitioner raised as his sole issue the sufficiency of the evidence. Relative to first degree murder, this court found that the evidence established premeditation, noting that the Petitioner left twice during an argument, went outside and retrieved his rifle, loaded it, and returned to the house to shoot the unarmed victim as she sat on the couch. Hatchel, 2015 WL 12978198, at *3-4. The Petitioner stated that he "ended up picturing [his] ex-wife's face" and shot the victim. Id. The Petitioner acknowledged in his police interview that he did not check on the victim, render aid to her, or call 9-1-1. After the killing, the Petitioner "drove around until his truck ran out of gas." Id. This court affirmed the first degree murder conviction.

### III. Post-Conviction Proceedings

The Petitioner filed a pro se post-conviction petition on October 26, 2015, alleging, in relevant part, that trial counsel was ineffective for failure to file a motion to suppress the Petitioner's police statements. Post-conviction counsel was appointed and filed an amended petition on December 2, 2015. A hearing was held on December 6, 2018.[2]

Trial counsel testified that he had been employed by the Public Defender's Office for twenty-five years. He and another assistant public defender represented the Petitioner in both General Sessions Court and Circuit Court; trial counsel became more involved with the case once it was bound over to Circuit Court. Before representing the Petitioner, counsel had been involved in "quite a few" murder cases, several of which went to trial. Counsel filed "standard" pretrial motions but acknowledged that he did not file a motion to suppress two statements made by the Petitioner.

Trial counsel testified that he was certain he discussed the Petitioner's confessions with him. The Petitioner told counsel "that they hadn't put everything he said" in the typed statements. Counsel denied that the Petitioner told him the confessions contained statements that he did not make. Counsel noted that in the confessions, the Petitioner stated that he did not remember his having sent a text message to his mother after the murder or the gun's being loaded. The Petitioner told counsel that he did not think the gun was loaded and "pulled the trigger because [he] wanted [the victim] to hear the click." Counsel stated that this "seem[ed] to go to the idea that it may have been an accident[.]"

---

[2] We note that the post-conviction hearing was delayed in part because the Petitioner's Rule 11 application for permission to appeal to our supreme court was still pending. After the supreme court's December 15, 2016 denial of the Petitioner's Rule 11 application, however, the delay in setting the case for a hearing is unexplained. The State did not file its response to the post-conviction petition until the day of the hearing.

When asked whether the confessions were damaging to the Petitioner's case, trial counsel responded, "Not compared to the – It came down to this. There was a videotape from outside which recorded the entire scene." Counsel stated that the recording showed the Petitioner arriving and leaving the house, which allowed the State to "pin down the exact times" the relevant events occurred, including the Petitioner's coming outside to retrieve a gun and pausing for a few seconds such that "it could be inferred that [he] was loading it[.]" Counsel acknowledged that the camera did not depict the inside of the house. When asked again whether the confessions were "much more incriminating than anything on the video," counsel stated that a child witness was in the house who knew that the Petitioner came in and left, heard the gunshot, and and found the victim. Counsel did not remember whether the child testified.

Trial counsel testified that he did not file a motion to suppress because the Petitioner's version of events "was consistent with pertinent parts of the investigation, and by having it come [into evidence], then [the Petitioner] wouldn't have to testify." Counsel noted that if the Petitioner testified, the State would have cross-examined the Petitioner regarding a pair of underwear found in his truck to establish a potential source of conflict between the victim and the Petitioner. Counsel stated that by "having [the Petitioner's] story come out through the statements he made, [counsel] thought it was more [consistent] with either an accident or second degree murder than would have been the case had he . . . had to try to explain the underwear and those sorts of things." Counsel denied that he made a mistake by deciding not to file a motion to suppress. Counsel explained that if the Petitioner had testified, it was a "no win" situation in which the Petitioner would have been portrayed as "deviant" for wearing women's underwear or as "unfaithful to [his] wife and she was the innocent party." Counsel averred that the Petitioner's statements did not indicate premeditation during the killing. Counsel stated that "[g]iven the video," he did not believe suppressing the Petitioner's statements would have made a difference in the outcome of the trial. Counsel noted that nothing in the statements was "really that damning in terms of the defense of accident or [the] defense of lack of premeditation."

On cross-examination, trial counsel testified that he had been engaged in the full-time practice of criminal law since 1988, that he had tried a "couple dozen" murder cases, and that the State's evidence was "pretty airtight" in the Petitioner's case. Counsel described the Petitioner's case as "one of the bad ones where there's a video that puts you there at the scene of the crime" and "a witness indoor[s] who . . . was a very sympathetic figure to have a small child be a potential victim in what the State alleged was a senseless killing." Counsel noted that there was "no triggering effect" to the Petitioner's behavior, that it did not make sense, and that it seemed to counsel to "smack of some kind of psychiatric disorder," although such a condition was not reflected by an expert's assessment. Counsel stated that the Petitioner drank alcohol the morning of the murder

-4-

and that the Petitioner believed he was intoxicated, although counsel noted that the Petitioner "wasn't so intoxicated that he had any problem driving up and down the roads that morning."

Trial counsel testified that in addition to the surveillance recording, the Petitioner admitted to shooting the victim in his confessions. Counsel affirmed that the Petitioner also mitigated his responsibility in the confessions. Counsel agreed that a question of the Petitioner's mental state existed and that he hoped the jury would find that "maybe [the Petitioner was] not classically psychotic, he[ was] not classically schizophrenic, he ha[d] no mental health history, but this [was] so out of the ordinary that" he acted with "something less than premeditat[ion]." Counsel stated that the Petitioner possibly could have been convicted of reckless homicide. Counsel did not feel that the Petitioner would be acquitted and stated that his best option was to "put the statement on so that [the jury] could hang their hat on a lesser included." Counsel said that he reviewed the surveillance recording and the Petitioner's recorded confessions and that the recordings were available to the jury if it had questions about portions of the Petitioner's recorded confessions not being reflected in the written versions. Counsel reiterated that he did not find any "material difference[s]" between the Petitioner's recorded and written confessions and that the written confessions were "basically correct."

When asked whether there was a basis to suppress the statements, trial counsel testified that the Petitioner was "Mirandized" before the January 26 interview and that the January 28 interview "may have been initiated" by the Petitioner. According to trial counsel, the first interview contained the Petitioner's recollection of loading the gun, pointing it at the victim, putting the gun back down, the victim's asking about money, and the Petitioner's "putting it in [his] ex-wife's face" and shooting the victim. The Petitioner stated in the interview that he "didn't realize what had happened and left" and that the Petitioner did not know why he shot the victim. In the second interview, counsel recalled the Petitioner statement that he "came to get back together with" the victim, as well as his describing "some problems" the Petitioner previously had regarding child support and his daughter with the victim. The Petitioner stated in the interview that he and the victim had discussed separating for a couple of weeks, but that to the Petitioner's knowledge, he did not know if the victim wanted a divorce. He told the police that he did not own a pistol.

Trial counsel reiterated that he felt prejudicial information would have come out had the Petitioner testified and that it was his strategy to "tell the story" by allowing the Petitioner's confessions to come into evidence. Counsel agreed that his strategy was to "try to get one juror's sympathy in this case about . . . some mental distress or just something to . . . mitigate [the Petitioner's] actions[.]"

-5-

The Petitioner testified that he and trial counsel reviewed discovery, including the confessions, and that the Petitioner told counsel that "they had stuff in there that [he] didn't say[.]" The Petitioner thought that counsel might try to suppress the confessions. The Petitioner stated that he thought the confessions were going to be damaging if the jury heard them, and he articulated his belief that if counsel had successfully suppressed them, the jury "would have [given the Petitioner] a lesser included instead of life." The Petitioner testified that in his opinion, the confessions and the surveillance recording were of equal importance and that both of them should have been suppressed.

On cross-examination, the Petitioner acknowledged that he was given a chance to review the written version of his January 26, 2013 confession before signing it and that he initialed it at the beginning and end of each paragraph. Although the Petitioner agreed that he reviewed and signed the written January 28, 2013 statement, he noted that he told the interviewing officers there "[were] a couple of things in there" that were incorrect and one of them "yelled at" the Petitioner and said, "It all means the same. Just sign it anyway." The Petitioner understood that the interview "was all video recorded as well[.]"

The post-conviction court denied the petition in a written order filed December 14, 2018. The court credited trial counsel's testimony and found that counsel "presented a reasonable defense . . . but a jury did not accept the defense." The court noted that the facts of the case "did not permit a reasonable finding of not guilty." The court found that counsel explained to the Petitioner the difficulty of a trial based upon the State's evidence. The court further found that the Petitioner had not established the factual allegations contained in his petition by clear and convincing evidence. The court determined that the Petitioner failed to show any deficient performance or prejudice. The Petitioner timely appealed.

ANALYSIS

The Petitioner contends that he received ineffective assistance of trial counsel due to trial counsel's failure to file a motion to suppress his two confessions. The State responds that counsel's decision not to file a motion to suppress was tactical and that the Petitioner has not proven prejudice.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual

issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

We initially note that although the post-conviction court found trial counsel to be generally credible, counsel's assertion that he did not seek suppression of the Petitioner's confessions in order to avoid the jury's hearing about women's underwear in the Petitioner's truck is not supported by the events at trial. Although the Petitioner did not testify and was not cross-examined about the underwear, the Petitioner's second confession included a statement that he wore women's underwear for a time. The confession was read into the record at trial, and the jury had access to the written statement as an exhibit. We further note that the trial record does not include a motion to redact the confession on the basis of relevancy or Rule 404(b) governing evidence of prior bad acts. We cannot conclude that this aspect of counsel's articulated reason for not filing a suppression motion was a sound one. However, the underwear issue had no bearing on the Petitioner's forming premeditation before killing the victim, and we cannot say that it made a difference in the Petitioner's trial.

Relative to a motion to suppress, counsel's decision not to seek suppression of the confessions in total was tactical; he explained in some detail that allowing the confessions into evidence was the best way for the Petitioner to explain his version of events, which was in some respects consistent with the other evidence, while mitigating

the Petitioner's culpability. Counsel's defense strategy was to convince the jury that the Petitioner had a non-traditionally-presenting mental illness; the Petitioner's two confessions, which were less than coherent, both mitigated his responsibility and called into question his mental state at the time of the shooting.

Moreover, the Petitioner has not alleged grounds upon which a motion to suppress would have succeeded and has, therefore, not proven that counsel was deficient for failing to file a motion to suppress. The record reflects that the Petitioner was fully informed of his rights and chose to waive them and make statements that were admissible at trial—although counsel could possibly have succeeded in redacting irrelevant portions of the statements, he would not have succeeded in suppressing the most damning portions of the confessions, those being the Petitioner's admitting to loading the gun and shooting the victim.

Furthermore, the proof of the Petitioner's killing the victim was overwhelming; the substantive issue was whether the Petitioner formed premeditation or whether the killing was accidental, as the Petitioner argued. The evidence at trial was sufficient even without the confessions for a reasonable jury to find that the Petitioner killed the victim with premeditation. The surveillance recording reflected the Petitioner's coming and going from the home and finally returning to the truck, lingering for two minutes, and reentering the home for a short time before departing. Hatchel, 2015 WL 12978198, at *1. The Petitioner told his mother that he and the victim had argued and that he was going to their home on the morning of the murder to try and reconcile with her. Id. The Petitioner later sent a text message to his mother indicating that he had hurt the victim badly, although he did not call 9-1-1, and no attempts to render aid to the victim were apparent at the crime scene. Id. The victim was unarmed. The Petitioner called 9-1-1 the next day and asked whether a warrant was issued for his arrest in connection with the shooting; he stated to the operator that he wished to turn himself in to the police. Id. The evidence was more than sufficient to support a finding of premeditation without the Petitioner's confessions. The Petitioner is not entitled to relief on this basis.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-8-